UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYANNEIL WILKINS | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:11-cv-989 (VLB) |
| J.C. PENNEY CORPORATION, INC., | : | |
| Defendant. | : | July 22, 2013 |

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [DKT. #25]

Before the Court is Defendant J.C. Penney Corporation, Inc.'s ("J.C. Penney") motion for summary judgment. The Plaintiff Ryanneil Wilkins ("Wilkins") brings this action alleging that he was discriminated against because of a perceived disability when J.C. Penney laid him off and then failed to rehire him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101, et. seq. For the following reasons, the Court grants Defendant's motion for summary judgment.

Facts

The following facts are undisputed unless otherwise noted. Wilkins worked at J.C. Penney's Manchester, Connecticut facility from August 15, 2007 until January 9, 2009 when he was laid off as a Carton Processing Associate. [Dkt. # 25-1, Local Rule 56(a)(1) Statement, ¶3]. J.C. Penney required every employee to acknowledge and review the policies and procedures of employment at J.C. Penney at the time the employee was hired. [*Id.* at ¶5]. The J.C. Penney

1

Associate Guide states that Wilkins' employment was at will, and could be terminated for any reason permissible under the law. [*Id.* at ¶6]. Throughout his time at J.C. Penney, his supervisors rated Wilkins' performance as "above expectations" and they considered him a valuable asset. [*Id.* at ¶7; Dkt. # 25-4, Exhibit B, Marc Christensen's Dep., at 131].

In July 2008, after about one year of working, Wilkins was involved in an off-duty car accident which resulted in a back injury. [Dkt. # 25-1, Local Rule 56(a)(1) Statement, ¶8]. The doctors at the hospital that treated Wilkins recommended that he take three days off from work, and instructed him to follow up with a doctor or chiropractor. [*Id.*]. J.C. Penney approved Wilkins' request for leave from July 8, 2008 to July 10, 2008. [*Id.*]. Wilkins returned to work the next week. [Dkt. #25-3, Ryanneil Wilkins's Dep., at 77]. On July 24, 2008, Dr. Mintz, a chiropractor recommended by Wilkins' attorney, treated Wilkins and recommended light duty work for him. [Dkt. # 25-1, Local Rule 56(a)(1) Statement, ¶8]. J.C. Penney accommodated Wilkins with light duty work until August 14, 2008. [*Id.* at ¶8].

Wilkins asserts that he was then forced by J.C. Penney to take Family and Medical Leave Act ("FMLA") leave after August 14, 2008. Wilkins testified that his supervisor, Marc Christensen ("Christensen"), informed him that he could not keep him on light duty work any longer because Wilkins' injury was not work related and therefore he was forced to take FMLA leave. [Dkt.#33-3, Ex. A, Wilkins Dep., at 92-95]. J.C. Penney asserts that Wilkins requested FMLA leave pending a MRI on his back. [Dkt. # 33-1, Local Rule 56(a)(2) Statement, ¶9]. J.C. Penney's

assertion is based on a letter it received on August 14, 2008, from Wilkins' doctor, Dr. Mintz, recommending that Wilkins remain out of work pending an appointment for his MRI.  [*Id.*].  The note read: "[Wilkins] will be receiving a MRI on August 25, 2008 and he has a follow-up scheduled for 8/27/2008.  It is our recommendation that the patient remain out of work until his follow-up apt." [Dkt. #33-5, Exhibit C, at 5].  J.C. Penney approved Wilkins' request for FMLA leave between August 14 through September 3, 2008 through its Illness Recovery Program.  [Dkt. # 33-1, Local Rule 56(a)(2) Stmt., ¶9].  J.C. Penney's Illness Recovery Program allows employees to take leave for medical treatment, regardless of whether the injury resulted from on the job or off duty occurrences.  [*Id.* at ¶10].  After Wilkins' MRI on August 27, 2008, Dr. Mintz released Wilkins to full duty work thereby ending his FMLA leave on September 3, 2008.  [*Id.*].  As soon as Dr. Mintz released Wilkins from light duty restriction on September 3, 2008, J.C. Penney's medical staff did as well and Wilkins returned to his pre-injury position without restrictions.  [*Id.* at ¶11].

Wilkins asserts that Christensen and another supervisor, Neil Campbell, excessively questioned him about his back injury when he returned to work after his MRI.  Wilkins testified that Christensen and Campbell would ask him whether his back was okay two to three times a day, for a period of approximately one month, after he returned to work on September 3, 2008 and resumed his former duties.  [Dkt. #25-3, Def. Ex. A, Wilkins Dep., at p.130-134, 137, 140-141].  Wilkins further testified that in October 2008 Campbell and Christensen stopped asking about his back because he kept telling them he was fine.  [*Id.*].

Wilkins also asserts that Christensen perceived him to be disabled from the major life activities of bending, twisting, exertion, pushing or pulling.  He contends that Christensen perceived him as disabled because Christensen "testified to remembering specific medical documents for Mr. Wilkins that were not contained in his personnel file, whereas other medical documents were kept on file" and because "specific medical records for Mr. Wilkins were intentionally removed from his personnel file in order to conceal Defendant's knowledge of Wilkins' limitations."  [Dkt. #33-1, Local Rule 56(a)2 Statement, Disputed Issue of Material Fact, ¶¶9,35-36]. In support of these assertions, Wilkins relies on Christensen's deposition testimony regarding Wilkins' medical records that were on file at J.C Penney.  [Dkt. #33-4, Def. Ex. B., Christensen Dep., at 140-42]. Christensen testified that J.C. Penney's medical file that was produced to Wilkins during this litigation "does not appear to include documentation which [he] recall[ed] Ryanneil Wilkins submitted" which provided restrictions for Wilkins' work following his injury.  [*Id.*].  Christensen further testified that this documentation "predated" Wilkins' application for short term disability benefits which coincided with his FMLA request.  [*Id.*]  No evidence has been offered in the record, though, to establish that Wilkins' file was incomplete and if so, how or why it came to be incomplete.

At the time of Wilkins' employment at J.C. Penney's Manchester facility, J.C. Penney had in place a written attendance policy ("Attendance Guidelines"), which rated each associate as either "excellent," "satisfactory," or "unsatisfactory" based on the associate's attendance record.  [Dkt. # 25-1, Local Rule 56(a)(1)

Statement, ¶12]. These ratings were assigned depending on the number of absences or occurrences accrued within a thirteen-week rolling period. [*Id.*]. The Attendance Guidelines do not distinguish between scheduled absences and unscheduled absences. [Dkt. #27-1, Exhibit C, Donna Ferris-Kotlik's Dec., at ¶13]. For example, the guidelines state that: "Doctor's notes do not excuse any occurrence. Occurrences supported by documentation do count toward an Associate's Attendance Rating." [*Id.*].

Under the policy, an "excellent" rating is given for zero to one occurrences per thirteen-week period, a "satisfactory" rating is given for up to two absences or three late arrivals or early quits per thirteen-week period, and an "unsatisfactory" rating is given for up to three absences or four late arrivals or early quits. [Dkt. #27-1, Exhibit C, Donna Ferris-Kotlik's Dec., at ¶11].

Wilkins asserts that he was never given written notice in the form of a policy or otherwise informed that employees approved for personal time off ("PTO") would be charged with an absence under the attendance policy. [Dkt. 33, Local Rule 56(a)2 Statement,¶12]. J.C. Penney's Attendance Policy is contained in a written handbook which Wilkins signed, acknowledging that he received and reviewed the attendance policies. [*Id.* at ¶5; Dkt. #33-1, Local Rule 56(a)2 Statement, ¶5; Dkt. #27-1, Exhibit C , at 39].

Following Wilkins' FMLA leave and after returning to his pre-accident duties, Wilkins was absent from work on October 26, 2008, October 27, 2008, November 23, 2008, and December 14, 2008. [Dkt.# 25-1, Local Rule 56(a)(1) Statement, ¶13]. J.C. Penney's attendance records show that Wilkins took unpaid

sick leave on October 26th, paid sick leave on October 27th and personal leave on November 23rd and December 14th, none of which Wilkins claims should have been considered FMLA leave.  [*Id.* at ¶¶13, 16].   J.C. Penney does not contend that this leave was considered FMLA leave, but rather that it is merely leave which is considered for purposes of calculating an employee's absence rating under the company's published attendance policy.  This record was used to track Wilkins' attendance rating which fell to the "unsatisfactory" category for that thirteen-week period.  [*Id.* at ¶¶14, 16].

The J.C. Penney Attendance Guidelines make certain recommendations for management to take when an associate's attendance rating changes.   The Guidelines recommend, but do not require, that the associate's supervisor notify the associate when his or her attendance rating changes to "satisfactory" or "unsatisfactory."   [Dkt. #33-5, Exhibit E, J.C. Penney Logistics Attendance Guidelines, at 27].   However, Wilkins was never personally notified by J.C. Penney management that his attendance was unsatisfactory until layoffs were made in January 2009.  [Dkt. # 33-1, Local Rule 56(a)(2) Statement, ¶12;  Dkt. # 25-1, Local Rule 56(a)(1) Statement, ¶17].   The last three absence occurrences were still "active" when Wilkins was terminated on January 10, 2009.   [*Id.* at ¶16].  Wilkins was not placed on probation, laid off or otherwise disciplined because of his attendance record.

In the fall of 2008, J.C. Penney's corporate headquarters made the decision to reduce staff in logistics facilities across the nation, including the Manchester, Connecticut facility.  [Dkt. # 25-1, Local Rule 56(a)(1) Statement, ¶18].   This staff

reduction was made because of the economic downturn which had a negative impact on J.C. Penney's sales.  [*Id*. at ¶18].  In the Manchester, Connecticut facility, the January 2009 staff reduction resulted in seventy-three associates being terminated.  [*Id*. at ¶19].  Seven Carton Process associates were affected by the January 2009 layoff and Wilkins had the most seniority out of the associates laid off.  [*Id*. at ¶24].

J.C. Penney asserts that it utilized a long-established formula for selecting the associates who would be affected by the staff reduction.  [*Id*. at ¶19].  J.C. Penney gave "bumping rights" to associates with more than two years of service when such associates were identified as layoff candidates.   [*Id*. at ¶19]. Therefore, any associate with more than two years of service was given preference by years of seniority to transfer into other positions at the Manchester facility.  [*Id*. at ¶19].  Wilkins, however, did not have two years of service, and therefore did not have any bumping rights.  [*Id*. at ¶19].

Christensen asserts he was on vacation for the last few weeks of December 2008 and when he returned he was given a list of people to lay off, which included Wilkins.  [Dkt. # 26-1, Exhibit D, Marc Christensen's Dec., at ¶14].  Christensen met with each of the eighteen second-shift associates affected by the layoff, including Wilkins.  [*Id*. at ¶15].  During this meeting on January 10, 2009, Christensen informed Wilkins he was ineligible for rehire due to his "unsatisfactory" attendance rating accrued in the thirteen week rolling period. [*Id*.].  Wilkins did not protest the characterization of the absences or his absence rating, nor did he question the decision at this time.  [*Id*.].  Wilkins asserts that he

7

had never been informed that he had an unsatisfactory attendance rating prior to being laid off nor was there a written policy stating that an employee with an unsatisfactory attendance rating at the time of a layoff is ineligible for rehire. [Dkt. #33-1, Local Rule 56(a)2 Statement, Disputed Issue of Material Fact, ¶19].

In May 2009, the Manchester facility began hiring for a new department. [Dkt. # 26-1, Exhibit D, Marc Christensen's Dec., at ¶20]. Once internal candidates were selected, former associates who were laid off and in good standing at the time of the layoff were contacted in the order of their seniority for rehiring. [*Id.*]. J.C. Penney asserts that a long-established, unwritten standard for J.C. Penney's corporate human resources department was to call back associates with a "satisfactory" attendance rating and a "satisfactory" performance rating for rehire. [Dkt. # 27-1, Exhibit C, Donna Ferris-Kotlik's Dec., ¶27]. J.C. Penney asserts that Wilkins' "unsatisfactory" attendance rating during that most recent thirteen-week period made him ineligible for rehire. [*Id.* at ¶27].

The Defendant asserts that Christensen did not have any input concerning the layoff or the recall of any associates, including Wilkins. [Dkt. #25-4, Exhibit B, Marc Christensen's Dep., at 86-87]. However, Christensen signed Wilkins' layoff form, in which it was indicated that Wilkins was not eligible for rehire because of his "unsatisfactory" attendance rating. [Dkt. # 33-5, Exhibit G, Associate Record Card, at 36]. The Defendant also asserts that Thomas Sanzo, the department manager, also did not have input in the recall process of any of the associates who were laid off in January 2009. [Dkt. #26-2, Exhibit E, Sanzo Dec., ¶5]. Wilkins contends that Christensen and Sanzo did have input in the decision to lay off and

rehire.  In support of this contention, Wilkins points to Christensen's deposition testimony which he characterizes as inconsistent as to the layoff and recall process and which he therefore argues supports an inference that he and Sanzo were actually involved in those decisions.  Christensen testified that he was verbally informed by "HR" that only associates with satisfactory attendance ratings would be eligible for hire and that he did not know who from HR made that determination.  [Dkt. #33-4, Pl. Ex. B, Christensen Dep., at 90-91].  Christensen then testified that HR confirmed it to his manager, Sanzo, who in turn confirmed it to him.  [*Id.* at 91].  Christensen further testified that he did not know if Sanzo told him that HR had informed him of the policy regarding rehire eligibility.  [*Id.* at 91-92].  Christensen explained that "I'm not HR.  I was just told to do what I was told to do" and that Sanzo did not tell him that HR made the determination.  [*Id.* at 92].  Christensen testified that Sanzo "is my manager and he has lots more experience than I do in this.  He gave me an instruction.  I did the instruction."  [*Id.* at 92].  He explained that he "got the impression" from Sanzo that the determination had been made by the "HR home office" in Texas and that Sanzo told him he got the instruction from the home office in Texas.  [*Id.* at 93].

Wilkins asserts that similarly situated non-disabled employees O'Neil Campbell and Ricardo Alvarado were either rehired or not laid off despite poor attendance ratings.  O'Neil Campbell, another Carton Process Associate, who had one month less seniority than Wilkins, was laid off in January 2009 but rehired on September 13, 2009 and continues to work for J.C. Penney.  [Dkt. # 25-1, Local Rule 56(a)(1) Statment, ¶22].  At the time of lay off in January 2009, O'Neil

Campbell had a "satisfactory" attendance rating for the immediately prior thirteen-week rolling period. [*Id.*]. During that period, O'Neil Campbell had one absence and one late arrival, which gave him a "satisfactory" rating under the attendance guidelines. [*Id.*]. In prior thirteen-week rolling periods, O'Neil Campbell had accrued several unsatisfactory attendance ratings. [Dkt.# 33-5, Pl. Ex. H]. Ricardo Alvarado, another Carton Process Associate who had greater seniority than Wilkins by one month, was not laid off in January 2009 because his seniority made him ineligible for the layoff. [Dkt. # 25-1, Local Rule 56(a)(1)Statement, ¶23].

<u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd*

*Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

Wilkins argues that J.C. Penney laid him off and failed to rehire him because it perceived him to be disabled in violation of the ADA.  The ADA states that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).  To establish a

prima facie case of employment discrimination under the ADA, a plaintiff must show "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. Wal-Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir. 2008). Claims of employment discrimination under the ADA are governed by the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Stephan v. West Irondequoit Cent. School Dist.*, 450 F' App'x 77, 79 (2d Cir. 2011). "Once a plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The burden then returns to the plaintiff to furnish evidence that the reason offered by the employer is a pretext." *Id.* (citations omitted).

There are two ways an individual may be "regarded as" having a disability: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Brown v. City of Waterbury B. of Educ.*, 722 F.Supp.2d 218, 225 (D. Conn. 2010) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999)). In other words, the employer must mistakenly believe that the employee has a substantially limiting impairment or, in the alternative, must mistakenly believe that the employee's impairment is substantially limiting. "A

'regarded as' [or perceived disability ADA] claim 'turns on the employer's perception of the employee' and is therefore a question of intent, not whether the employee has a disability.'" *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (quoting *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998)).   "It is not enough that the employer perceive the employee as 'somehow disabled'; the employer must regard the employee as disabled within the meaning of the ADA,' *i.e.,* having an impairment that substantially limits a major life activity."   *Id.* (citation omitted).

"To establish a disability [within the meaning of the ADA], plaintiff must (1) show that [he] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a 'major life activity, and (3) show that [his] impairment substantially limits the major life activity previously identified."   *Kravtsov v. Town of Greenburgh*, No.10-cv-3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) (internal quotation marks and citations omitted).   Disability is broadly defined by the ADA.[1]   "[T]emporary,

---

[1] Since Wilkins's "regarded as" claim arises after January 1, 2009, the ADA Amendment Act of 2008 ("ADAAA") governs the analysis of perceived disability. The ADAAA "substantially broadened the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines,* 527 U .S. 471 (1999) and *Toyota Motor Mftrg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined."   *Hutchinson v. Ecolab, Inc.*, No.3:09cv1848(JBA), 2011 WL 4542957, at *7 (D. Conn. Sept. 28, 2011).   Under the ADAAA, the definition of "disability" is construed in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).   "Disability" as defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(1).   "The ADAAA expanded the interpretation of the ADA's three-category definition of 'disability.' For example, 'major life activity' includes 'caring for oneself, performing manual tasks ...

non-chronic impairments of short-duration, with little or no long term or permanent impact, are usually not disabilities" within the meaning of the ADA. *Kennebrew v. N.Y. City Housing Auth.,* No. 01 CIV 1654, 2002 WL 265120, at *18 n. 32 (S.D.N.Y. Feb. 26, 2002); *Leahy v. Gap. Inc.,* No. 07–CV–2008, 2008 WL 2946007, at *4 (E.D.N.Y. July 29, 2008) ("For purposes of the ADA, short term, temporary restrictions are not 'substantially limiting' and do not render a person 'disabled.'"); *Green v. N.Y. City Health & Hosp. Corp.,* No. 04–CV–5144, 2008 WL 144828, at *4 (S.D.N .Y. Jan. 15, 2008) ("To establish a disability under the ADA, there must be some proof of permanency."); *Adams v. Citizens Advise Bureau,* 187 F .3d 315, 316-17 (2d Cir. 1999); *Williams v. Salvation Army,* 108 F. Supp. 2d 303, 312-13 (S.D.N.Y. 2000) ("temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact, are usually not disabilities."). "It appears that even under the ADAAA's broadened definition of disability short term impairments would still not render a person disabled within the meaning of the statute." *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 211 (D. Conn. 2012). Therefore, a plaintiff may not succeed on a "regarded as" claim where an employer only perceives the employee to have suffered a short term temporary impairment.

J.C. Penney argues that Wilkins' ADA claim fails because J.C. Penney did not perceive or regard Wilkins as disabled within the meaning of the ADA and further it chose not to rehire Wilkins because of his unsatisfactory attendance

---

walking, standing, lifting, bending, speaking, breathing. ., and working,' as well as 'the operation of a major bodily function,' including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.'" *Hutchinson,* 2011 WL 4542957, at *8 (quoting Pub.L. No. 110–325, 122 Stat. 3553, 3555 (2008)).

rating in the most recent thirteen-week rolling attendance period prior to the layoff.  Wilkins contends that J.C. Penney perceived his injury as substantially limiting the major life activities of bending, twisting, exerting, pushing, and pulling and failed to rehire him because of this perceived disability.   Wilkins principally argues that the following facts demonstrate that J.C. Penney perceived him as disabled and discriminated against him because of this perceived disability: (i) J.C. Penney was aware of his back injury and his doctor's recommended work restrictions following that injury, (ii) J.C. Penney accommodated his injury with light duty tasks for a short period of time and then forced him to take FMLA leave, (iii) his supervisors excessively questioned how his back was doing after his return from FMLA leave, (iv) J.C. Penney did not lay off a similarly situated non-disabled employee who had poor attendance ratings, and (v) J.C. Penney rehired a similarly situated non-disabled employee who had poor attendance ratings.

   The fact that J.C. Penney was aware that Wilkins had suffered a back injury, which temporarily limited his ability to bend, twist, exert, push, and pull from the time of his accident in July 2008 to September 3, 2008 when he returned to and performed his work full-time without any restrictions, accommodated that injury for three months by assigning him to light duty tasks until it had no more to assign and then granted him FMLA leave beginning on August 14, 2008 when his doctor opined that he could no longer work does not demonstrate that J.C. Penney perceived him to be disabled within the meaning of the ADA.  Courts have routinely held that placing an employee on FMLA or other sick leave or

accommodating an injury or condition without more does not constitute evidence that the employer perceived that employee as disabled for purposes of the ADA. *See e.g., Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 52 n.2 (2d Cir. 2012) (holding that fact that employer allowed employee leave under the FMLA without more does not demonstrate that employer regarded employee as disabled and therefore "this evidence is not enough to defeat the summary judgment motion."); *O'Reilly v. Consolidated Edison Co. of New York, Inc.*, 374 F. Supp. 2d 278, 288 (E.D.N.Y. 2005) ("Moreover, although defendant approved sick leave for plaintiff based on the injury to her Achilles tendon and her representations to her doctors, this does not constitute evidence that they perceived plaintiff as being disabled within the meaning of the ADA, since, as explained above, a temporary impairment does not constitute a 'disability' for ADA purposes"); *Miller v. McHugh*, 814 F. Supp. 2d 299, 317-18 (S.D.N.Y. 2011) (holding that employer's grant of temporary accommodations for employee did not demonstrate that employer believed that employee was suffering from a disability that substantially limited her ability to engage in a major life function); *Divergillio v. Peet*, No.3:06CV2048(AWT), 2009 WL 909428, at *5 (D. Conn. Mar. 31, 2009) (finding that refusal to give employee additional light duty status because her injury was not work related did not support an inference that employer perceived employee as disabled); *Boyd v. City of New York Parks and Recreation*, No.05Civ.6962, 2008 WL 5092841, at *8 (S.D.N.Y. Dec. 2, 2008) ("While [employer] was aware that Plaintiff had been injured, it ha[d] no reason to believe that Plaintiff's condition substantially limited his ability to work."); *Kramer v. Hickey-Freeman, Inc.*, 142 F.

Supp. 2d 555, 560 (S.D.N.Y. 2001) (holding that the "Court cannot accept that defendant's offer to grant plaintiff a leave of absence itself proves that defendant regarded plaintiff as disabled."); *Graham v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 451 F. Supp. 2d 360, 372-73 (D. Conn. 2006)(holding that placing employee on short term disability did not demonstrate that employer considered employee to be disabled within the meaning of the ADA) (collecting cases).

Further, the mere fact that Wilkins' supervisors, Christensen and Campbell, demonstrated concern for Wilkins' health by asking him about his back several times a day for about a month after he returned to work full-time without any restrictions on September 3, 2008 likewise does not support an inference that J.C. Penney considered Wilkins to be disabled for ADA purposes, particularly where they assigned him the same work he had been assigned prior to his injury. *Diggs v. Town of Manchester*, 303 F.Supp.2d 163, 184-85 (D. Conn. 2004) ("At most the evidence showed that the Town and some of Plaintiff's officers were concerned about his ability to perform as a firefighter given the stressful nature of the job. That concern does not equate to regarding him as unable to perform a wide range of jobs.  Therefore, Plaintiff has failed to establish that he was 'regarded as' disabled so as to fall within the protection of the ADA"); *see also Pater v. Deringer Mfg. Co.*, No.94C7047,1995 WL 530655, at *4 (N.D. Ill. Sept. 7, 1995) (Plaintiff "points to the fact that people asked her how she was feeling, but the existence of mere inquiries as to her health by members of the management does not prove that they believed that she was disabled or treated her as such."); *Mack*

17

*v. Strauss*, 134 F. Supp. 2d 103, 110 (D.D.C. 2001) (holding that "concern for plaintiff's health does not establish that [employer] believed that plaintiff was unable to perform his job or that he was impaired in any major life function. [Employer's] concern for plaintiff's health does not establish that she regarded plaintiff as disabled."); *Hill v. Steven Motors, Inc.*, 228 F. Supp. 2d 1247, 1258 (D. Kan. 2002) ("Plaintiff's only evidence on this point centers on comments allegedly made by [employee] suggesting concern for her health.  However, it is uncontroverted that these comments were made while [plaintiff] was still recovering from her stroke, at a time when plaintiff's own evidence establishes that she was unable to return to work. Plaintiff has not identified any evidence demonstrating or suggesting that the defendant regarded her as disabled once she was released to return to work").

In addition, as Wilkins was only questioned about his back for a period of a month following his full return to work in September and was assigned and performed his regular work duties full-time without any restrictions or accommodations from September 3, 2008 until he was laid off in January 2009, that evidence cannot support an inference that J.C. Penney perceived him as having anything other than a temporary impairment.  *See e.g., Young v. Benjamin Dev. Co., Inc.*, No. 03Civ.10209, 2009 WL 498933, at *8 (S.D.N.Y. Feb. 17, 2009) (finding that because employer "continued to assign Plaintiff orders involving similar tasks through the period that Plaintiff alleges that he was 'disabled,' Plaintiff ha[d] not demonstrated that Defendants regarded him as disabled."); *Amendola v. Henderson*, 182 F. Supp. 2d 263, 276 (E.D.N.Y. 2001) (finding that "all

evidence points to the conclusion that the defendant perceived plaintiff as merely requiring post-operative recovery time following his foot surgeries between April and June of 1993. As a result, the evidence is insufficient to permit the inference that the defendant perceived plaintiff as having an impairment that substantially limited him in one or more major life activities."); *Edwards v. Brookhaven Science Assocs., LLC*, 390 F. Supp. 2d 225, 232 (E.D.N.Y. 2005) (holding that plaintiff failed to demonstrate that employer regarded him as disabled under the ADA because the undisputed evidence showed that his injury was temporary and did not limit plaintiff's "ability to perform daily tasks").   Here too J.C. Penney made temporary accommodations owing to Wilkins' injury, but only in response to the recommendations of Wilkins' doctor and only until Wilkins' doctor cleared him to return to work without restriction.

This evidence, even when viewed in the light most favorable to Wilkins, at best demonstrates that J.C. Penney perceived Wilkins to have a temporary, non-chronic impairment of short-duration, which is not enough to establish that it regarded him as disabled within the meaning of the ADA.   As the Second Circuit has explained, to accept Wilkins's arguments in this regard would "discourage employers from taking … preliminary or temporary steps to keep their employees happy for fear that showing concern for an employee's alleged medical problems could draw them into court facing an ADA claim based on a perceived disability." *Price*, 458 F. App'x at 52 n.2 (internal quotation marks and citation omitted).

Wilkins also argues that the disparate treatment afforded to similarly situated non-disabled employees demonstrates that J.C. Penney's failure to

rehire him was attributable to its perception of a disability and thereby rebuts its proffered reason for failing to rehire.  "A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case."  *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 493 (2d Cir. 2010) (internal quotation marks omitted).  The "standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," such that "the comparator must be similarly situated to the plaintiff in all material respects."  *Id.* at 494 (internal quotation marks omitted).  "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct."  *Id.* at 493–94 (internal quotation marks omitted).  This standard "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases"—a determination that must be made based on both "an examination of the acts" *and* "an examination of the context and surrounding circumstances in which those acts [we]re evaluated."  *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir. 2000).  "As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury.  This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 n. 2 (2d Cir.2001)  (internal citations omitted).

Here, Wilkins points to two employees he alleges were similarly situated and were not laid off or rehired despite poor attendance ratings. The first employee is Ricardo Alvarado who was a Carton Process Associate like Wilkins. Wilkins charges that Alvarado, who only had one month more seniority than Wilkins, was not laid off despite the fact that he had inferior performance and attendance ratings. However, Wilkins admits that Alvarado's seniority had made him ineligible for the layoff according to the formula J.C. Penney used to determine which staff would be affected by the layoff. [Dkt. # 33-1, Local Rule 56(a)(2) Statement, ¶23]. As Alvarado was not eligible for the layoff because of his seniority, he was not similarly situated in all material respects to Wilkins who was eligible for the layoff. It is clear that no reasonable jury could find the similarly situated prong met here where there is no dispute as to Alvarado's eligibility for the layoff and therefore the evidence regarding Alvarado can neither raise an inference of perceived disability discrimination nor rebut J.C. Penney's proffered reasons for not rehiring Wilkins.

The second employee is O'Neil Campbell who was a Carton Process Associate like Wilkins and had one month less seniority than Wilkins. Wilkins contends that O'Neil Campbell was laid off in January 2009 but was rehired in September 2009 despite inferior attendance ratings. However, it is undisputed that at the time Campbell was laid off he had achieved a satisfactory attendance rating in the most recent thirteen-week rolling attendance period prior to the layoff. During that thirteen-week period he had one absence and one late arrival. In contrast, Wilkins had an unsatisfactory attendance rating for that same period

in which he had four absences from work.  Further, J.C. Penney has presented evidence that it considered those most recent thirteen-week rolling period attendance ratings to determine which employees were eligible for rehire. Therefore the fact that O'Neil Campbell had accrued more unsatisfactory attendance ratings in total than Wilkins over his career at J.C. Penney cannot raise an inference of discrimination in light of the fact that J.C. Penney considered the most recent thirteen-week period attendance ratings to determine rehire eligibility.  As O'Neil Campbell had a better attendance rating than Wilkins for that period prior to the layoff which was the basis for J.C. Penney's determination regarding rehire eligibility, no reasonable juror could find that O'Neil Campbell was similarly situated to Wilkins.  "It is well settled that employees are not similarly situated if they have materially different disciplinary records*." Dinkins v. Suffolk Transp. Serv., Inc.*, No. 07–CV–3567, 2010 WL 2816624, at *10 (E.D.N.Y. July 15, 2010) (collecting cases); *Rosario v. Hilton Hotels Corp.*, 476 F. App'x. 900, 901 (2d Cir. 2012) (holding that although some of the plaintiff's co-workers received greater wage increases than the plaintiff, "he failed to establish that he was 'similarly situated' to those employees, given his disciplinary history at that time"); *Santiago v. City of New York*, No. 05–CV–3668, 2009 WL 935720, at *10 (E.D.N.Y. Mar. 31, 2009) ("[P]laintiff's history of absences  and attendance counseling makes her not similarly situated to other [correctional officers] with similar records and tenure but without a history of absenteeism.").  Here, O'Neil Campbell is not similarly situated to Wilkins

because he had a materially better attendance rating in the period on which J.C. Penney based its rehire eligibility determination.

Wilkins also contends that an inference of disability discrimination and pretext is demonstrated by the fact that there was no written policy that an unsatisfactory attendance rating will make an employee ineligible for rehire and by the fact that he should not have obtained an unsatisfactory attendance rating prior to being laid off.  Wilkins contends that he should not have obtained an unsatisfactory rating because his PTO absences should not have been considered absences under J.C. Penney's policy and because he was not notified of his unsatisfactory rating as required by J.C. Penney's policy.  Wilkins reasons that PTO absences should not be counted under the policy because it was neither communicated to him nor expressly part of the policy that PTO absences would count towards attendance ratings.  However, none of these points raises genuine issues of material fact as to whether J.C. Penney either perceived Wilkins as disabled within the meaning of the ADA or whether their proffered reason was a pretext for unlawful disability discrimination.  The fact that J.C. Penney did not have a written policy setting forth eligibility for rehire without more cannot raise an issue of material fact, nor can Wilkins' disagreement with how PTO absences were treated under the policy or the fact that he wasn't notified of his rating.  Moreover, Wilkins has failed to present any evidence that J.C. Penney discriminatorily applied its attendance policy, for example, by not treating PTO absences of similarly situated non-disabled employees as absences under the policy counting towards the attendance rating.  This is particularly true as J.C.

Penney contends and Wilkins does not dispute that he was laid-off by application of J.C. Penny's long-standing lay-off policy.  Wilkins does unavailingly contend that the policy was not evenly applied, a contention which the Court addressed above.

Wilkins also argues that an inference of discrimination is demonstrated by the fact that he was never informed that he had accrued an unsatisfactory attendance rating prior to being laid off and by the fact that he was the most senior employee laid off.   Wilkins acknowledged in writing his receipt and review of J.C. Penney's attendance policy and therefore should have known the implications of his absences without having to be told.  In addition, presumably he was absent legitimately and thus a prior warning would not have altered his rating.  Further, no juror could conclude that Wilkins was discriminated against as a result of a perceived disability because he had not been informed after December 14, 2008 that his latest absence had triggered an unsatisfactory attendance rating based on a policy with which he acknowledged his familiarity.

In sum, J.C. Penney's development and consistent application of its lay-off policy fails to raise genuine issues of material fact that Wilkins' seniority and absence rating were pretexts for disability discrimination.  There is no discernible nexus between Wilkins' seniority and absence rating on one hand and a perceived disability on the other hand.

Wilkins also contends that his supervisor, Christensen, perceived him as disabled because during his deposition Christensen testified to remembering a piece of medical documentation that outlined work restrictions for Wilkins

resulting from his back injury which was not included in J.C. Penney's medical file on Wilkins.  Wilkins argues that the fact that this document was missing from his file supports an inference that J.C. Penney intentionally removed this document to conceal its knowledge of his limitations.  First, even in the absence of this document, Wilkins' file was replete with evidence that he sustained and was being treated for a back injury, that he was temporarily disabled, that he could only perform, requested and received light duty, and that he took FMLA leave due to his disability.  Any missing document is cumulative of the evidence in his file and this it is implausible that the document was removed to conceal Wilkins' disability.

Further, as explained above, the fact that Christensen was aware of both Wilkins' injury and limitations and accommodated the work restrictions recommended by Wilkins' doctor cannot establish that Christensen regarded Wilkins as having a disability within the meaning of the ADA regardless of whether the document was or was not a part of Wilkins's file.   Further, the fact that this document was absent from J.C. Penney's file on Wilkins does not support a reasonable inference that J.C. Penney intentionally removed it to cover up its illegal discrimination.  Such speculation cannot stand in the place of reasonable inferences drawn from admissible evidence.  Accordingly, no reasonable juror could conclude based on this evidence that Christensen

perceived Wilkins to be disabled for ADA purposes or that J.C. Penney intentionally destroyed evidence in Wilkins' file to cover up its bias.[2]

Lastly, Wilkins argues that the temporal proximity between his injury in July 2008 and the end of his FMLA leave in September 2008 and the date he was laid off in January 2009 supports an inference of discrimination based on perceived disability.  In support of this argument, Wilkins mistakenly applies the holdings, concepts and terminology from precedent regarding First Amendment retaliation claims, *Gorman-Bakos v. Cornell Co-Op Extension of Schenectady County*, 252 F.3d 545 (2d Cir. 2001) and retaliatory discharge claims, *Reed v. A.W. Lawrences & Co.,Inc.*, 95 F.3d 1170 (2d Cir. 1996), which are not applicable to his general claim for employment discrimination.   Wilkins has not asserted claims for retaliatory discharge under the ADA, retaliation under the FMLA, or First Amendment retaliation and therefore his arguments regarding a causal connection through temporal proximity between the "protected activities" of his injury / FMLA leave and his layoff are misguided.[3]

---

[2] As there is no evidence that Christensen perceived Wilkins to be disabled within the meaning of the ADA or was driven by anti-disability animus, the dispute of fact regarding whether Christensen and Sanzo were involved in the decisions to lay off and then not rehire Wilkins which is predicated on Wilkins' characterization of Christensen's testimony as inconsistent is immaterial. Assuming that Christensen and Sanzo were involved in those decisions, because there is no evidence that would support an inference that either of them perceived Wilkins to be disabled for ADA purposes and were biased against the disabled, their role in such a determination could not demonstrate that J.C. Penney failed to rehire Wilkins because of a perceived disability.

[3] To the extent that Wilkins is attempting to assert a retaliatory discharge claim under the ADA, a FMLA retaliation claim or a First Amendment retaliation claim, he may not do so as"[i]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion."  *Thomas v. Egan,* 1 F. App'x 52, 54 (2d Cir. 2001); *see also Greenidge v. Allstate Ins. Co.,* 446 F.3d 356,

The Court will consider Wilkins' broader argument that an inference of perceived disability discrimination is demonstrated by the temporal proximity between his injury in July or the end of his FLMA leave in September and when he was laid off six and four months respectively later in January despite the fact that he has not legally asserted this claim. As discussed above, the fact that Wilkins suffered an injury and was granted FMLA leave alone cannot establish that J.C. Penney regarded him as disabled for ADA purposes irrespective of any temporal proximity between that injury or FMLA leave and his layoff. Moreover, assuming that an inference of perceived disability discrimination could be drawn from the fact that Wilkins was laid off six months after injuring his back and four months after returning from FMLA leave, the undisputed facts that Wilkins returned to work and performed his regular duties without any restrictions for four months prior to his layoff and without any inquiries concerning his back for three months prior to his layoff would defeat such an inference. For all of the above reasons, Wilkins has failed to present a question of material fact as to whether J.C. Penney perceived him as disabled within the meaning of the ADA or whether J.C. Penney's stated reason for failing to rehire him was pretext for discrimination.

---

361 (2d Cir. 2006) (declining to reach merits of argument raised for first time in opposition to summary judgment); *Russo v. Keough's Turn of the River Hardware, LLC,* No.11CV994, 2012 WL 4466626, at *6 (S.D.N.Y. Sept. 25, 2012) ("It is well-settled that a court is not required to consider new theories of liability raised for the first time in opposition to summary judgment."); *Scott v. City of New York Dep't of Corr.,* 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (explaining that facts and theories raised for the first time in opposition to summary judgment should not be considered in resolving a summary judgment motion), *aff'd,* 445 F. App'x 389 (2d Cir. 2011); *Hughes v. McWilliams,* No. 04 Civ. 7030(KMW), 2009 WL 4823940, at *13 n. 6 (S.D.N.Y. Dec.15, 2009) (same).

## Conclusion

For the foregoing reasons, the Court GRANTS Defendant's [Dkt. # 25] motion for summary judgment.  The Clerk is directed to enter judgment in favor of Defendant and to close the case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: July 22, 2013